# Exhibit 2

Chicago ASSOCIATION OF REALTORS®

**CHICAGO ASSOCIATION OF REALTORS®**

**EXCLUSIVE RIGHT TO SELL LISTING AGREEMENT**

*© 2025 by Chicago Association of REALTORS® - All rights reserved*

REALTOR® EQUAL HOUSING OPPORTUNITY

**This contract is intended to be a binding Real Estate contract. This contract is not a government-specified form. The Brokerage and Seller may negotiate any of the terms of this contract before signing. The amount and how Brokerage commissions are formulated are not set by law and are fully negotiable prior to execution of this contract.**

**1. PARTIES.** This Exclusive Right to Sell Listing Agreement ("***Agreement***") is entered into by and between sponsoring broker Chicago's Real Estate Agency, LLC ("***Brokerage***") and Ariane Holtschlag, not individually, but solely as Trustee of the Bankruptcy Estate of QCD Financial LLC ("***Seller***"). In consideration of the following agreements and Brokerage's efforts to procure a ready, willing and able buyer for the sale or exchange of property and improvements described below (including the undivided interest in the common elements and accumulated reserves, if any) (collectively, "***Property***"), Seller hereby grants Brokerage the exclusive right to sell (or, at Seller's direction, lease, exchange, joint venture or grant an option to purchase) the Property (collectively, "***Transfer of Property***") pursuant to the terms and conditions set forth below ("***Exclusive Right***").

**2. TERM.** Brokerage's Exclusive Right shall begin on August 7, 2026 ("***Effective Date***") and shall extend until 11:59 P.M. on August 31, 2028, at which time this Agreement shall automatically terminate ("***Termination Date***"). Notwithstanding anything in this paragraph to the contrary, in the event that the Termination Date is more than one year from the Effective Date, Seller may terminate this Agreement on 11:59 p.m. on the date that is one year after the Effective Date (deemed the "Termination Date" if applicable) by providing 30 days prior written notice to Brokerage. In the event that this Agreement is terminated pursuant to this paragraph, the provisions of Section 22 do not apply. From the date of Seller's acceptance of any offer and execution of a contract for the Transfer of Property ("***Accepted Offer***"), unless the Accepted Offer is expressly subject to the continual marketing of the Property, Brokerage shall have no further obligation to market, advertise for sale or show the Property. Once all of the contingencies for the Accepted Offer have been satisfied or waived, Brokerage shall have no further obligation to Seller except to present Seller with any offers or counteroffers pertaining to the Property.

**3. PRICE.** Seller directs Brokerage to market the Property for sale at a price of $ See Exhibit Q ("***Marketing Price***"). The Marketing Price may be changed at Seller's written direction. If Seller has not accepted a contract by N/A, 20____ at 11:59 p.m., then the Marketing Price shall be changed to $ N/A.

***Check if applicable***

☐ Seller also directs Brokerage to market the Property for lease at a price of $ N/A per month ("***Rental Price***"). The Rental Price may be changed at Seller's written direction. If Seller has not accepted a contract by N/A, 20____ at 11:59 p.m., then the Rental Price shall be changed to $ N/A per month.

**4 PROPERTY.**

Address: See Exhibit Q Unit Number(s):__________________

City:______________________________________________ State:____________ Zip Code:______________________

Parking Space Number(s): __________ Parking is: ☐ Deeded; ☐ Limited Common Element; ☐ Assigned; ☐ Indoor; ☐ Outdoor

Storage Space Number(s):__________ Storage is: ☐ Deeded; ☐ Limited Common Element; ☐ Assigned

**5. POSSESSION.** Seller shall surrender possession of the Property in broom-clean condition and remove all debris and personal property not conveyed to the buyer before closing of the transaction set forth in the purchase and sale agreement or lease, unless otherwise agreed to in writing.

**6. DESIGNATED AGENT.** Brokerage and Seller hereby agree that (a) Donald J. Felton II, a sponsored licensee of Brokerage, is Seller's exclusive designated agent ("***Designated Agent***") with Brokerage, and (b) neither Brokerage nor other sponsored licensees of Brokerage will be acting as agent for Seller. Brokerage shall have the discretion to appoint a substitute designated agent for Seller as Brokerage determines necessary, and Seller shall be advised within a reasonable time of any such substitution. Seller understands and agrees that Brokerage and any of Brokerage's other sponsored licensees may enter into agreements with prospective buyers of the Property as agents of those buyers.

**7. MINIMUM SERVICES.** Pursuant to the Illinois Real Estate License Act of 2000 (225 ILCS 454/1 et seq.), as amended, Brokerage, through the Designated Agent, must provide to Seller, at a minimum, the following services: (a) accept delivery of and present to Seller


© 2025 by Chicago Association of REALTORS® - All rights reserved

offers and counteroffers to buy, sell, lease or otherwise transfer any interest in the Property or any portion thereof; (b) assist Seller in developing, communicating, negotiating and presenting offers, counteroffers and notices that relate to the offers and counteroffers until a lease or purchase agreement is fully executed and all contingencies are satisfied or waived; and (c) answer Seller's questions relating to the offers, counteroffers, notices and contingencies.

**8. SELLER DUTIES.** Seller warrants that Seller has the authority to execute this Agreement and to deal with and on behalf of the Property as provided in this Agreement. Seller shall comply with the Real Estate Settlement Procedures Act of 1974, as amended, if applicable, and furnish all information required for compliance with the Act, and, if applicable, Seller agrees to comply with the Residential Real Property Disclosure Act, as amended.

From and after the Effective Date of this Agreement, Seller agrees to:

(i) cooperate fully with Brokerage and the Designated Agent; (ii) refer all inquiries to Brokerage and the Designated Agent; (iii) allow access and entry to the Property at convenient times by Brokerage, the Designated Agent and cooperating brokers (whether alone or accompanied by Brokerage or the Designated Agent) for the purpose of showing the Property to prospective buyers or lessees; (iv) if the Property is leased or occupied by a tenant, to comply with Paragraph 8(E) of this Agreement; (v) conduct all negotiations through Brokerage or the Designated Agent; and (vi) pay Brokerage compensation pursuant to the terms of Paragraph 11 below.

~~A. **Title. At least 5 days prior to closing,** Seller shall furnish an owner's title insurance policy in the amount of the purchase price showing good and merchantable title, and execute and deliver, or cause to be executed and delivered, to the buyer a proper instrument of conveyance.~~

B. ~~**Survey.** If the Property is not a condominium or a cooperative, then prior to closing, Seller shall furnish to the buyer at least 5 days prior to closing a survey by a licensed land surveyor dated not more than 6 months prior to date of closing (as defined in Seller's Real Estate Sale Contract) showing the present location of all improvements on the Property. If the buyer or buyer's mortgagee desires a more recent or extensive survey, then the survey shall be obtained at the expense of either the buyer or seller, as agreed to by buyer and Seller.~~

C. **Lock Box.**

Seller ***(check one)*** ○ [does] **OR** ● [does not] authorize Brokerage and its agent to place an electronic or combination lock box on the Property in accordance with the terms and conditions of this Agreement for the purpose of providing a means to access the Property by (i) cooperating real estate agents and (ii) other parties customarily involved in a real estate transaction including vendors or service providers, provided that other parties are accompanied by the Brokerage or Designated Agent, or prior notice is given to Seller of each access by vendors or service providers and Seller does not object.

In addition to the authorization granted above, Seller also authorizes the following unlicensed individuals (example: unlicensed assistant, photographer, etc..) access to the lock box whether they are accompanied or unaccompanied by the Brokerage or Designated Agent: TBD________________________________________. Additional authorizations may be provided by Seller in writing. Seller may provide authorization for additional individuals to access the Property using the Lock Box by providing written permission (e.g. by email, text message, or letter) to Designated Agent.

Whether authorized here or in the future by Seller's written direction, Seller shall hold Brokerage, its agents, and any Multiple Listing Service, of which Brokerage is a participant, harmless from any and all liability, claims, judgments, obligations, or demands against Brokerage and/or Designated Agent as a result of Seller's authorization to use a "Lock Box," including, but not limited to, any and all liabilities and costs, including reasonable attorneys' fees, incurred by Brokerage and/or Designated Agent as a result of this authorization, except for any criminal or gross negligence on the part of the Brokerage and/or Designated Agent. If no selection is made, Seller shall be deemed to have provided Brokerage and its agent the authorizations provided in this subsection.

D. **Seller's Personal Property.** Seller has been advised by Brokerage of the importance of safeguarding or removing valuables now located within the Property and the need to obtain personal property insurance through Seller's insurance company.

E. **Leased Property.** If the Property is leased or occupied by a tenant, Seller acknowledges and agrees to the following: (i) Seller has notified and advised the tenant and occupants of this Agreement, including, without limitation, the terms and provisions of Paragraph 8(C); (ii) Seller will comply with all of the provisions of the Chicago Residential Landlord and Tenant Ordinance and any other laws, regulations, and ordinances relating to the provision of notice to, and obtaining permission from, any tenant or occupant of the Property for the Brokerage, its agent, cooperating real estate agents, and prospective buyers or lessees to enter the Property during reasonable times during the term of the Agreement; (iii) it is Seller's responsibility to keep


© 2025 by Chicago Association of REALTORS® - All rights reserved

the Brokerage informed of any times that Seller's tenant or occupant has not agreed to provide access to the Property; and (iv) Seller has advised all of the tenants and occupants of the Property of the importance of safeguarding or removing valuables now located within the Property and the need to obtain personal property insurance during the term of this Agreement.

**9. <u>FAIR HOUSING AND NONDISCRIMINATION</u>. IT IS ILLEGAL FOR EITHER SELLER OR THE BROKERAGE TO REFUSE TO DISPLAY, LIST, LEASE OR SELL, OR REFUSE TO NEGOTIATE FOR THE LEASE OR SALE OF, OR OTHERWISE MAKE UNAVAILABLE OR DENY, REAL ESTATE TO ANY PERSON BECAUSE OF ONE'S MEMBERSHIP IN A PROTECTED CLASS, E.G.: RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, ANCESTRY, AGE, MARITAL STATUS, PHYSICAL OR MENTAL DISABILITY, FAMILIAL STATUS, OR ANY OTHER CLASS PROTECTED BY ARTICLE 3 OF THE ILLINOIS HUMAN RIGHTS ACT OR FEDERAL FAIR HOUSING LAWS. SELLER AND BROKERAGE ACKNOWLEDGE THAT THEY SHALL ALSO BE BOUND BY THE PROVISIONS OF STATE AND LOCAL (CITY AND/OR COUNTY) HUMAN RIGHTS OR FAIR HOUSING ORDINANCES IF ANY AND AGREE TO COMPLY WITH SAME.**

***Seller Initials:*** _AH_ ______ ***Seller Initials:*** __________

**10. <u>BUYER LOVE LETTERS</u>.** A potential buyer of the Property may include in or with their offer personal information about the potential buyer or the potential buyer's family. These communications are often referred to as "Buyer Love Letters" or "Offer Letters." This personal information may include photos and information about the potential buyer or the potential buyer's family being a member of a protected class (e.g. race, color, religion, national origin, sex, ancestry, age, marital status, physical or mental disability, family status, or any other class protected by the Article 3 of the Illinois Human Rights Act or federal fair housing laws). Receipt of such information may expose Seller to claims that the personal information influenced Seller's decisions with regards to the sale of the Property in a manner that violates the Illinois Human Rights Act and/or federal and local fair housing laws.

***Check and initial if applicable***

☑ Seller **does not** desire Brokerage or Designated Agent to provide Seller with any "Buyer Love Letters" or "Offer Letters", whether provided by the buyer or buyer's agent. If Seller indicates that it does not desire Brokerage to provide Seller with such "Buyer Love Letters or "Offer Letters", Seller is (i) waiving the Brokerage's duties to present all offers to Seller pursuant to Section 15-15 of the Real Estate License Act of 2000, 225 ILCS 454/15-15, and (ii) authorizing Brokerage and Designated Agent to withhold from Seller any Buyer Love Letter or Offer Letter that includes personal information about the potential Buyer or potential Buyer's family being a member of a protected class. If Brokerage or Designated Agent does withhold such personal information, Brokerage or Designated Agent will still provide Seller with information about the amount of the offer and other material terms contained in the offer.

***Initial if Checked: Seller Initials:*** _AH_ ***Seller Initials:*** __________

**11. <u>LISTING BROKERAGE COMPENSATION</u>.** For providing its services to Seller pursuant to this Agreement, Seller agrees to pay an upfront fee to Brokerage for professional services in the amount of ***(check one)*** ○ $ N/A ( ***"Listing Fee"***) **OR** ◉ None. Unless stated otherwise in this Agreement, the Listing Fee (if applicable) is non-refundable and due upon signing of this Agreement.

In addition to the Listing Fee, Seller shall pay Brokerage as follows: ***(check all that apply)***

☑ A. **<u>Percentage Commission.</u>** Seller shall pay Brokerage a commission in the amount of 20 **%** [percent] of the purchase price set forth in the purchase and sales contract plus $ NA ("***Listing Commission***")

☑ B. **<u>Flat Rate.</u>** Seller shall pay Brokerage a flat rate of $ 450.00 (***"Brokerage Fee"***).

☐ C. **<u>Unrepresented Buyer Compensation.</u>** If a buyer for the Property is not represented by a licensed real estate broker, for Brokerage's additional ministerial and administrative assistance that may be caused by a buyer being unrepresented, Seller agrees to pay Brokerage an additional compensation of NA % [percent] of the purchase price set forth in the purchase and sales contract plus $ N/A (***"Unrepresented Buyer Compensation"***). Seller agrees that the Unrepresented Buyer Compensation is in addition to the Listing Commission or Brokerage Fee.

☐ D. **<u>Rental Commission.</u>** In the event Seller enters into a leasing agreement with a tenant during the term of this Agreement, Seller agrees to pay Brokerage a rental commission of N/A plus $ N/A (***"Rental Commission"***). In the event the Property is later purchased by the tenant, or an option to purchase is later granted to and exercised by the tenant, then in addition to the Rental Commission, Seller must pay Brokerage the Listing Commission, Brokerage Fee, or the fees set forth in Section 11.E below.


© 2025 by Chicago Association of REALTORS® - All rights reserved

☐ E. **Other.** N/A ______________________________________________ (***"Other Compensation"***)

The Listing Commission, Brokerage Fee, Unrepresented Buyer Compensation, Rental Commission, and Other Compensation are referred to collectively as ***"Listing Brokerage Compensation"***. Brokerage shall be entitled to the Listing Brokerage Compensation (a) upon the closing of any Transfer of Property prior to the Termination Date, regardless of whether the Transfer of Property resulted from the service and/or effort of the Brokerage, Designated Agent, Seller or any other persons or entities; (b) upon the closing of any Transfer of Property within 180 days after the Termination Date to any person to whom the Property was submitted prior to the Termination Date; or (c) upon Seller's default in a purchase and sales contract with a ready, willing, and able buyer.

Notwithstanding the foregoing, if (i) the Property is residential property of four units or less, (ii) the Termination Date has passed, and (iii) Seller has entered into a valid, bona fide, written listing agreement with another licensed real estate broker during the 180 day period, then Brokerage shall not be entitled to any Listing Brokerage Compensation pursuant to this Agreement on any Transfer of Property. For Property which is not residential property of four units or less, if the Property is listed with another licensed real estate broker during the 180 day period following the Termination Date, Seller shall be liable for the entire Listing Brokerage Compensation.

No amendment or alteration with respect to the amount of Listing Fee or Listing Brokerage Compensation, or time of payment of Listing Fee or Listing Brokerage Compensation, shall be valid or binding unless made in writing and signed by the parties hereto. Listing Brokerage Compensation is to be paid at time of execution and delivery of deed, option, lease, joint venture agreement, or installment agreement for deed, whichever occurs first, and Brokerage is authorized to deduct the Listing Brokerage Compensation and expenses from the earnest money deposit at that time.

**12. <u>BUYER BROKERAGE COMPENSATION</u>.** Seller may receive offers from buyers that include, as a term of the purchase and sales contract, Seller's contribution toward the buyer's brokerage compensation. Seller and buyer may negotiate Seller's contribution toward buyer's brokerage compensation through the purchase and sales contract.

**In the event that Seller elects to contribute toward any of buyer's brokerage compensation, the costs for any buyer's brokerage compensation is in addition to, and separate from, Listing Brokerage Compensation and will not be paid out of or deducted from Listing Brokerage's Compensation.**

**Acknowledgement:** ***Seller Initials*** __Initial AH____ ***Seller Initials*** _________

**13. <u>DISBURSEMENT OF EARNEST MONEY</u>. Seller authorizes Brokerage to accept earnest money from potential buyers to be held by Brokerage in an escrow account maintained in accordance with existing law. At the closing, Brokerage may withdraw from such earnest money deposit the Listing Brokerage Compensation and other expenses or fees paid on behalf of, or at the direction of Seller, in the event the transaction is consummated. It is expressly understood that Brokerage shall not be liable for acts in good faith as Escrowee.**

If a dispute arises between Seller and the buyer as to whether a default had occurred and Brokerage acts as Escrowee of earnest money, Brokerage shall hold the earnest money and pay it out as agreed to in writing by Seller and the buyer, or as directed by a court of competent jurisdiction.

In the event of a dispute, Seller agrees that Brokerage, as Escrowee, may give written notice to Seller and buyer of the intended disbursement of Earnest Money, indicating the manner in which Escrowee intends to disburse in the absence of any written objection. If neither party objects in writing to the proposed disposition of the Earnest Money within 30 days after the date of notice, then Escrowee shall proceed to dispense the Earnest Money as previously noticed by Escrowee. If either Seller or buyer objects in writing to the intended disposition within the 30 day period, then the Brokerage may deposit the funds with the Clerk of the Circuit Court by the filing of an action in the nature of an Interpleader. Seller agrees that Brokerage may be reimbursed from the earnest money for all costs, including reasonable attorneys' fees and court costs, related to the filing of the Interpleader and hereby agrees to indemnify and hold Brokerage harmless from any and all claims and demands, including the payment of reasonable attorneys' fees, costs and expenses arising out of the default, claims and demands. If Seller defaults, the earnest money, at the option of the buyer, and upon written direction by Seller and the buyer or as directed by a Court of competent jurisdiction, shall be refunded to the buyer and Seller shall not be released from any of its obligations under this Agreement. Notwithstanding anything in this Agreement to the contrary, disbursement of earnest money shall be in accordance with the Real Estate License Act of 2000, as amended.


© 2025 by Chicago Association of REALTORS® – All rights reserved

**14. <u>DUAL AGENCY</u>.** By checking "Yes" and signing below, Seller acknowledges and agrees that the Designated Agent ("***Licensee***") may act as a Dual Agent (represent both seller and buyer or landlord and tenant) for the sale or lease of property. Seller acknowledges they were informed of the possibility of this type of representation. Before signing this document please read the following:

Representing more than one party to a transaction presents a conflict of interest since both clients may rely upon Licensee's advice and the client's respective interests may be adverse to each other. Licensee will undertake this representation only with the written consent of ALL clients in the transaction. Any agreement between the clients as to a final contract price and other terms is a result of negotiations between the clients acting in their own best interests and on their own behalf. You acknowledge that Licensee has explained the implications of dual representation, including the risks involved, and understand that you have been advised to seek independent advice from your advisors or attorneys before signing any documents in this transaction.

**WHAT A LICENSEE <u>CAN</u> DO FOR CLIENTS WHEN ACTING AS A DUAL AGENT:**

1. Treat all clients honestly. 2. Provide information about the property to the buyer or tenant. 3. Disclose all latent material defects in the property that are known to the Licensee. 4. Disclose the financial qualification of the buyer or tenant to the seller or landlord. 5. Explain real estate terms. 6. Help the buyer or tenant arrange for property inspections. 7. Explain closing costs and procedures. 8. Help the buyer compare financing alternatives. 9. Provide information to seller or buyer about comparable properties that have sold so both clients may make educated decisions on what price to accept or offer.

**WHAT A LICENSEE <u>CANNOT</u> DISCLOSE TO CLIENTS WHEN ACTING AS A DUAL AGENT:**

1. Confidential information that the Licensee may know about a client, without that client's express consent. 2. The price or terms the seller or landlord will take other than the listing price without permission of the seller or landlord. 3. The price or terms the buyer or tenant is willing to pay without permission of the buyer or tenant. 4. A recommended or suggested price or terms the buyer or tenant should offer. 5. A recommended or suggested price or terms the seller or landlord should counter with or accept.

If either client is uncomfortable with this disclosure and dual representation, please let Licensee know. You are not required to sign this document unless you want to allow Licensee to proceed as a Dual Agent in this transaction. By signing below, you acknowledge that you have read and understand this form and voluntarily consent to Licensee acting as a Dual Agent (that is, to represent BOTH the seller or landlord and the buyer or tenant) should that become necessary.

**Seller must select one option below:**

○ **Yes, I have read the above information and provide my Prior Consent to Dual Agency**

◉ **No, I <u>do not</u> consent to Dual Agency**

**Seller Signature:** Signed by: Ariane Holtschlag 581FC80C77DE4F7... ____________________ **Seller Signature:** ________________________________________

**15. <u>ADDITIONAL TERMS AND PROPERTY INFORMATION</u>.** Seller represents that the following information is true and correct as of the date of this Agreement and shall keep Brokerage and Designated Agent informed of all changes to the following information:

(a) Property P.I.N. # See Exhibit Q ______________________ Homeowner's Exemption: ☐ Yes ☐ No

Real estate taxes for the year 20____ equal $________________ Senior Citizen's Exemption: ☐ Yes ☐ No

Senior Freeze Exemption: ☐ Yes ☐ No

— — — — ________ P.I.N. # See Exhibit Q ______________________

Real estate taxes for the year 20____ equal $________________

(b) Seller is aware of any circumstances that would affect the transfer of title? ☐ Yes ☐ No

(example: probate, divorce, liens, lis pendens, judgments, etc.)

If yes, please explain: ________________________________________________________________

(c) ~~Is Property currently leased? ☐ Yes ☐ No~~

~~If yes, lease expiration date is ________________; rent amount is $______________per____________~~

~~security deposit amount (if any) is $____________________~~

(d) **Municipal Energy Disclosure.** Please enter the Electricity and/or Gas Account Numbers for the Property:

Electricity Account Number: N/A ______________________ Gas Account Number: N/A ______________________


© 2025 by Chicago Association of REALTORS® – All rights reserved

(e) The lot size is approximately N/A
Approximate square feet of the interior of the Property: N/A

(f) **Illinois Condominium Property Act or Cooperative Apartments.** Seller shall comply with the Real Estate Settlement Procedures Act of 1974, as amended. If the Property is a condominium, within 15 days after both parties execute this Agreement, Seller shall furnish to Brokerage a complete set of condominium documents, including the declaration, bylaws, rules, regulations, budget, and meeting minutes. If the Property is a townhouse or condominium and dependent upon the condominium or homeowner association's governing documents, either upon execution of this Agreement or upon Seller's acceptance of an offer by buyer, Seller shall promptly notify the appropriate representative of the condominium association or any affiliated organization of the contemplated transaction. Seller shall furnish to the buyer a statement from an authorized officer or agent of the condominium association certifying payment of assessments for condominium common expenses, and if applicable, proof of waiver or termination of any right of refusal or general option contained in the declaration of condominium together with any other documents required by the declaration of condominium or its bylaws as a precondition to the transfer of ownership. At closing, Seller shall deliver to the buyer all appropriate documents properly endorsed and a survey or plat of the condominium unit showing the location of all improvements of the unit and further showing any parking spaces or garages that will be conveyed. Seller shall comply with all of the conditions and stipulations of the Illinois Condominium Property Act (765 ILCS 605/1 et seq.), as amended, as may be applicable.

If the Property is a cooperative apartment, within 15 days after both parties execute this Agreement, Seller shall furnish to Brokerage the cooperative documents including without limitation the proprietary lease, stock certificate, trust agreement, and bylaws. If the Property is a cooperative, then, no later than 15 days after both parties execute this Agreement Seller shall furnish to Brokerage a complete set of cooperative documents, including the proprietary lease or trust agreement, bylaws, and if available, a survey.

~~**Seller shall complete the following information:**~~

~~Management Contact: ____________________~~

~~Management Phone: ____________ Management Email: ____________~~

~~Current monthly assessment equals $____________~~

~~Assessment includes: ____________________~~

~~Waiver of Right of First Refusal necessary? ☐ Yes ☐ No~~

~~Seller ***(check one)*** ☐ [is] **OR** ☐ [is not] aware of a proposed special assessment. Seller shall keep Brokerage informed of all Board of Directors/Managers actions. Seller shall keep Brokerage informed of any change to this information.~~

~~If applicable, the total amount of special assessment is $____________ with a remaining balance due of $____________ payable through ____________. Special assessments of $____________ are payable ***(check all that apply)*** ☐ Annually; ☐ Semi-Annually; ☐ Quarterly; ☐ Monthly.~~

(g) If this property is new construction, Rider 13, "New Construction Insulation Disclosure", must be completed and attached.

(h) If the Property is income or commercial property, Seller shall provide Brokerage with accurate copies of all leases, income and expense statements,
a rent roll, existing environmental reports and relevant information necessary to market the property within 14 days after the date both parties execute this Agreement.

(i) For residential properties located within the City of Chicago, local ordinances require that all properties must have smoke and carbon monoxide detectors present and in working condition. Seller shall comply with these ordinances. In addition, Seller shall provide Brokerage with the following, if applicable, within 72 hours after both parties execute this Agreement: (a) Illinois Residential Real Property Disclosure Report; (b) Heat Disclosure; (c) Lead Paint Disclosure; (d) Radon Disclosure; and (e) Zoning Certificate.

**16. <u>INDEMNITY</u>**. To the extent permitted by law, Seller agrees to indemnify, defend and hold Brokerage, its licensees, agents, employees, managers, members, shareholders, directors, officers and successors (the "Indemnified Parties") harmless from all claims, disputes, litigation, expenses and reasonable legal fees arising from (a) failure by Seller to disclose any facts, damage or material defects, latent or otherwise, relating to the Property; (b) any misrepresentation by Seller to Brokerage or a buyer; (c) any dispute between Seller and buyer or any third party, or a dispute between any third party and Brokerage arising out of performance of this Agreement, including without limitation disputes as to the disposition of any earnest money deposit held by Brokerage, and personal injuries or


© 2025 by Chicago Association of REALTORS® - All rights reserved

death sustained by visitors to the Property; (d) that Seller failed to pay, either in whole or in part, a buyer brokerage compensation to a buyer's brokerage when due; or (e) a breach of this Agreement by Seller. Seller agrees to safeguard and/or remove any valuable personal property in the Property (e.g., jewelry or artwork) and represents and warrants that it has personal property insurance on its personal property. Seller further agrees that Brokerage and the Indemnified Parties shall not be liable for any personal injury, death, damage to the Property, or damage to or theft of Seller's personal property caused by third-parties, including without limitation, individuals or companies that provide home staging services.

**17. PROMOTING AND ADVERTISING PROPERTY PER THE ILLINOIS REAL ESTATE LICENSE ACT OF 2000, AS AMENDED.** Brokerage is hereby authorized to promote and advertise the Property as Brokerage deems appropriate, including but not limited to (i) displaying signs on the Property, (ii) placing the Property in any multiple listing service in which Brokerage participates at the time a contract is executed, (iii) promoting the Property on Brokerage's internet website, social media sites, and on the internet websites of other brokers, and/or through any other advertising medium which Brokerage may subscribe to or otherwise use, and (iv) releasing information as to the amount of the selling price, type of financing, and number of days to sell this Property to any multiple listing service in which Brokerage participates at the time a contract is executed. Brokerage's sole duty is to use Brokerage's best efforts to affect a Transfer of Property, and Brokerage is not charged with the custody of the Property, its management, maintenance, upkeep or repair.

Consistent with the foregoing, any internet website on which the Property is promoted may (a) allow third parties to write comments or reviews about the Property, or display a hyperlink to such comments or reviews, or (b) include an automated estimate of the fair market value of the Property, or display a hyperlink to such an estimate. The foregoing notwithstanding, by checking one or both of the boxes at the end of this Paragraph 17, and writing its initials below, Seller requests that on any internet website on which the Property is promoted, one or both of these features be disabled or discontinued. Brokerage in turn will disable or discontinue such designated features on its website, and will communicate to each multiple listing service in which it participates, and to each broker or other third party on whose internet website the Property is promoted or advertised, that Seller has elected to have one or both of these features disabled or discontinued. However, notwithstanding any such Seller request, a broker's internet website may (1) communicate the broker's professional judgment concerning the Property, and (2) notify its customers and visitors to its website that a feature has been disabled or discontinued "at the request of Seller".

Disable/Discontinue Website Features ***(check any that apply and initial)***:

☐ Disable/Discontinue Comments/Reviews regarding Property;
☐ Disable/Discontinue Automated Estimate of Market Value of Property.

*Initial if Checked: Seller Initials:* _________ *Seller Initials:* _________

~~**18. FIXTURES AND PERSONAL PROPERTY.** In conjunction with any Accepted Offer, Seller agrees to transfer by a bill of sale, all heating, electrical, and plumbing systems that are owned by Seller and serve the Property together with the following to the buyer:~~

*(check or enumerate applicable items.)*

| | | | |
|---|---|---|---|
| ☐ Refrigerator____ | ☐ Smart Doorbell____ | ☐ Central Air Conditioner____ | ☐ Window Treatments____ |
| ☐ Oven/Range____ | ☐ Smart Lock____ | ☐ Window Air Conditioner____ | ☐ Tacked Down Carpeting____ |
| ☐ Microwave____ | ☐ Intercom System____ | ☐ Smart Thermostat____ | ☐ Fireplace Screen/Equipment___ |
| ☐ Dishwasher____ | ☐ Security System____ | ☐ Electronic air filter____ | ☐ Fireplace Gas Log____ |
| ☐ Garbage Disposal____ | ☐ Owned OR ☐ Rented | ☐ Central Humidifier____ | ☐ Firewood____ |
| ☐ Trash Compactor____ | ☐ Satellite Dish____ | ☐ Radiator Covers____ | ☐ Attached Gas Grill____ |
| ☐ Washer____ | ☐ Attached TV(s)____ | ☐ Lighting Fixtures____ | ☐ Existing Storms and Screens____ |
| ☐ Dryer____ | ☐ TV Antenna____ | ☐ Ceiling Fan____ | ☐ Outdoor Play Set/Swings____ |
| ☐ Water Softener____ | ☐ Multimedia Equipment____ | ☐ Electronic Garage Door(s) with ___remote unit(s)____ | ☐ Outdoor Shed____ |
| ☐ Sump Pump____ | ☐ Stereo Speakers and/or Surround Sound____ | ☐ Built-in or Attached Shelves Shelves or Cabinets____ | ☐ All Planted Vegetation____ |
| ☐ Smoke & Carbon Monoxide Detectors____ | | | ☐ Other Equipment ____________________ |

Seller also transfers the following: N/A

The following items are excluded from the sale: N/A


© 2025 by Chicago Association of REALTORS® – All rights reserved

**19. MULTIPLE LISTING SERVICE (MLS).** MLS rules require Brokerage to input Property into the MLS within 48 hours of the Effective Date of this Agreement. If Seller does not want the Property inputted into the MLS within 48 hours of the Effective Date, Seller may provide such direction by checking an option below.

Seller understands the implications of not submitting Property into the MLS database and authorizes Brokerage as follows: ***(check only one)***

- ☐ A. Do not submit Property to the MLS for a period of ______ calendar days from the Effective Date of this Agreement.
- ☐ B. Do not submit Property to the MLS until ______________________ *(date)*.
- ☑ C. Do not submit Property to the MLS until additional service(s) (e.g. virtual tours, professional photography, painting, staging, etc.) has been completed. Type of service(s): As completed within 180 business days of execution. pictures are not required
- ☐ D. Do not submit Property to the MLS during the entire term of this Agreement.
- ☐ E. Do not submit Property to the MLS until given further written notice.

**20. DISPUTE RESOLUTION.** The parties agree that any dispute, controversy or claim arising out of or relating to this Agreement, any breach of this Agreement by either party, or Brokerage's relationship with Seller pursuant to this Agreement shall be resolved only by arbitration in accordance with the Code of Ethics and Arbitration Manual of the National Association of REALTORS®, as amended from time to time, through the facility of the Chicago Association of REALTORS®. The parties agree to be bound by any award rendered by any professional standards arbitration hearing panel of the Chicago Association of REALTORS® and further agree that judgment upon any award rendered by a professional standards arbitration hearing panel of the Chicago Association of REALTORS® may be entered in any court having jurisdiction. The parties agree to execute any arbitration agreements, consents and documents as may be required by the Chicago Association of REALTORS® to facilitate any arbitration. SELLER HEREBY WAIVES WITH RESPECT TO ANY DISPUTE WITH BROKERAGE THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR OTHER REPRESENTATIVE ACTION IN COURT, EITHER AS A CLASS REPRESENTATIVE OR CLASS MEMBER OR THE RIGHT TO JOIN OR CONSOLIDATE CLAIMS WITH OTHER INDIVIDUALS.

**21. REPRESENTATION OF MULTIPLE SELLERS.** Seller understands and agrees that Brokerage may from time to time represent or assist other sellers who may be interested in selling property to the buyers with whom Brokerage has a buyer agency contract or with whom Brokerage is working as a customer. Seller consents to Brokerage's representation of other sellers before, during and after the expiration of this Agreement and expressly waives any claims, including, but not limited to, breach of fiduciary duty or breach of contract, based solely upon Brokerage's representation or assistance of other sellers who may be interested in selling property to the buyers with whom Brokerage has a buyer agency contract or with whom Brokerage is working as a customer.

**22. TERMINATION OF AGREEMENT.** In the event that one or both of the parties desires to terminate this agreement, except for termination done pursuant to paragraph 2 of this Agreement, this paragraph applies.

A. **Termination by Mutual Agreement.** The parties may mutually agree to terminate this Agreement at any time, provided that Seller shall pay to Brokerage any amounts agreed to by the parties, if any, within 5 business days of termination.

B. **Termination by Seller.** Seller shall have the right to terminate this Agreement at any time and for any reason by providing notice to Brokerage. In the event that Seller terminates this Agreement pursuant to this subsection for any reason other than a breach of this Agreement by Brokerage, Seller shall pay to Brokerage, within 5 business days of termination, the greater of (i) any amounts owed pursuant to Paragraph 11 of this Agreement or (ii) the sum of $ N/A, which fee shall compensate Brokerage for its services prior to termination, plus Brokerage's reasonable expenses to list and market the Property.

C. **Termination by Brokerage.** Brokerage shall have the right to terminate this Agreement at any time and for any reason by providing notice to Seller. In the event that Brokerage terminates this Agreement pursuant to this subsection for any reason other than a breach of this Agreement by Seller, Brokerage shall not be entitled to fees or reimbursement of Brokerage's costs. In the event that Brokerage terminates this Agreement due to Seller's breach of this Agreement, Seller and Brokerage agree that calculating Brokerage's actual damages may be difficult; therefore, Seller shall pay to Brokerage, within 5 business days of termination, the Listing Brokerage Compensation as defined in Paragraph 11 based on the purchase price in the purchase and sales contract or Marketing Price if no contract as liquidated damages and to compensate Brokerage for Brokerage's time, expenses and services involved in marketing the Property.

**23. NOTICE.** All notices required by this Agreement shall be in writing and shall be served upon the Parties at the addresses provided in this Agreement. The mailing of notice by registered or certified mail, return receipt requested, shall be sufficient service. Notices may also be served by personal delivery or commercial delivery service or by the use of a facsimile machine. In addition, facsimile


© 2025 by Chicago Association of REALTORS® – All rights reserved

signatures or digital signatures shall be sufficient for purposes of executing this Agreement and shall be deemed originals. E-mail notices shall be deemed valid and received by the addressee when delivered by e-mail and opened by the recipient. Each Party shall retain a copy of proof of facsimile transmission and email notice and provide such proof, if requested.

**24. MISCELLANEOUS.**

A. Where applicable, the singular form shall include the plural, and the masculine form shall include the feminine and neuter, and vice versa.

B. This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties to this Agreement.

C. Business Days are defined as Monday through Friday, excluding Federal holidays. Business Hours are defined as 8:00 A.M. to 6:00 P.M. Chicago Time.

**25. ADDITIONAL TERMS AND ATTACHMENTS.** BANKRUPTCY TRUSTEE ADDENDUM

**SELLER:**

Seller's Signature: Signed by: Ariane Holtschlag 581FC80C77DE4F7...

Seller's Signature: ______

Date: 8/13/2026

All Legal Title Holders or Legal Agent for Seller:

______

______

Seller's Name (print): Ariane Holtschlag, not individually, but solely as Trustee of the Bankruptcy Estate of QCD Financial LLC

Seller's Name (print): ______

Address: ______

City: ______ State: ______ Zip: ______

Cell Phone #: (217) 855-0962

______ Phone #: ______

______ Phone #: ______

______ Phone #: ______

Email Address 1: aholtschlag@ph-firm.com

Email Address 2: ______

**BROKERAGE:**

Designated Managing Broker Name: Donald J. Felton, II

Signature: DocuSigned by: Donald J. Felton 218E10DDB69E4CD...

Date: 8/13/2026

Brokerage Name: Chicago's Real Estate Agency

Address: 2013 N. Bingham St.

City: Chicago State: IL Zip: 60647

Office Phone: 312-330-7949 Fax: ______

Office MLS ID: 18969

Designated Agent Name (print) Donald J. Felton, II

Designated Agent MLS ID: 176924

Agent Phone 1: 312-330-7949

Agent Phone 2: ______

Agent Fax: ______

Agent Email: Don@DonFelton.com


© 2025 by Chicago Association of REALTORS® – All rights reserved

MRED Midwest Real Estate Data REinventing MLS

innovator AWARDS 2013 WINNER

Top 100 TOP 50

RESO Real Estate Standards Organization CHARTER MEMBER

# MLS Listing Exemption Authorization

This is an acknowledgement ("Acknowledgement") dated 8/13/2026 regarding the listing of the property known as **See Exhibit Q** ("Property"), hereinafter **Ariane Holtschlag, not individually, but solely as Trustee of the Bankruptcy Estate of QCD Financial LLC** is referred to as "Owner" and **Donald J. Felton, II** is referred to as "Broker".

1. **MULTIPLE LISTING SERVICE:** Broker is a participant/customer to MRED's multiple listing service ("MLS"), the prevalent database of properties for sale or rent in the greater Chicagoland metropolitan area that is disseminated to and accessible by all other real estate agents who are participants/customers to the MLS or a reciprocal MLS. MRED's purpose is to support its nearly 40,000 real estate professionals in their cooperative efforts to bring together buyers and sellers, renters and lessors and assist in the real estate transaction process.

2. **MANDATORY SUBMISSION TO MLS:** The MLS requires brokers participating in the service to submit all exclusive right to sell, exclusive right to lease, and exclusive agency listings for real property to the MLS within 72 hours of obtaining all necessary signatures of the seller(s) or lessor(s) on the listing agreement. If Owner declines to permit the listing to be disseminated via the MLS **AND** the property is not advertised to the general public through a website or utilizes any publicly accessible print advertisements, including for sale signs, a listing exemption form shall be signed by Owner indicating that Owner does not desire the listing to be immediately filed with the MLS and the listing exemption form shall be filed with the MLS upon request.

3. **EXPOSURE TO BUYERS AND RENTERS THROUGH MLS:** Listing property with the MLS exposes the Property to all real estate brokers and managing brokers who are participants/customers of the MLS or any reciprocating MLSs, and potential buyer and renter clients of those brokers and managing brokers. The MLS may further transmit the MLS database to internet sites or apps that post property listings online.

4. **BROKER DUTIES:** While a listing is accessible 24/7 to all MRED's MLS participants/customers, Owner's Broker continues to maintain the listing by arranging for showings of the Property according to the procedures he/she has explained to Owner. Whether or not a property is listed in the MLS, Broker will remain responsible for providing the minimum services required by law to Owner.

5. **REALTOR® CODE OF ETHICS**: As a member of the National Association of REALTORS® (NAR), all MRED participants/customers agree to abide by NAR's code of ethics and cooperate with all brokers in making your property available for showings to prospective buyers or renters. They also adhere to strict NAR guidelines for the presentation and negotiation of contracts, thus furthering the interest of both the client and the public.

6. **NO ADDITIONAL FEES:** There are no additional listing costs charged by MRED for the placement of your Property's listing into MRED's MLS database.

7. **IMPACT OF EXCLUSION OF PROPERTY FROM MLS:** If Property is excluded from the MLS, Owner understands and acknowledges that (a) real estate brokers and managing brokers from other real estate offices who have access to the MLS, and their buyer or renter clients, may not be aware that Owner's Property is offered for sale or lease; (b) information about Owner's Property will not be transmitted by MRED to various real estate internet sites used by the public to search for property listings; and (c) real estate brokers, managing brokers and members of the public may be unaware of the terms and conditions under which Owner is marketing the Property.

8. **FAIR HOUSING**: Owner's decision to exclude the Property from the MRED MLS database is based upon reasons other than a refusal or reluctance on Owner's part to show, list, negotiate or sell the Property to an individual on the basis of one's membership in a protected class, e.g.: race, color, religion, national origin, sex, ancestry, age, order of protection status, marital status, physical or mental disability, military status, sexual orientation, familial status or any other class protected by Article 3 of the Illinois Human Rights Act. Owner acknowledges that they shall also be bound by the provisions of federal, state and local (city and/or county) human rights or fair housing laws (if any) and agree to comply with same.

9. **SELLER OPT-OUT:** Owner understands the implications of not submitting Property to MRED's MLS database and authorizes Broker as follows (Check only one):
   - A. ☐ **Do not submit Property to the MLS for a period of ________ calendar days from the commencement of the listing.**
   - B. ☐ **Do not submit Property to the MLS until ____________(date).**
   - C. ☑ **Do not submit Property to the MLS until additional service(s) (e.g. virtual tours, professional photography, painting, staging, etc.) has been completed. Type of service(s): As completed within 180 business days of execution. pictures are not required**
   - D. ☐ **Do not submit Property to the MLS during the entire listing provided for in the Agreement.**
   - E. ☐ **Do not submit Property to the MLS until given further written notice.**

## FAX THIS FORM TO 630-955-0353 OR EMAIL TO: mlsexempt@mredllc.com

**By signing below, Owner acknowledges that Owner has read, understands, accepts and has received a copy of this form.**

Owner Signature ______________________ Date ________
Address ______________________ State ______ Zip ______

Owner Signature Signed by: Ariane Holtschlag 581FC60C77DE4F7... Date 8/13/2026
Address ______________________ State ______ Zip ______

Real Estate Broker (Firm) Chicago's Real Estate Agency, LLC Listing Agent ID # **176924**
By (Managing Broker) **Donald J. Felton, II**
Address **2013 N. Bingham St., Chicago** State **IL** Zip **60647**

Managing Broker Signature DocuSigned by: [signature] 218E10DDB69E4CD...

# EXHIBIT Q

| Form 1 # | Property Address | Property PIN | Marketing Price |
|---|---|---|---|
| 2 | 1340 W 110TH PL CHICAGO IL 60643 | 25-17-329-030-0000 | $10,000 |
| 3 | 1342 W 110TH PL CHICAGO IL 60643 | 25-17-329-029-0000 | $10,000 |
| 4 | 6929 S MLK DR CHICAGO IL 60637 | 20-22-414-009-0000 | $10,000 |
| 6 | 6700 S EBERHART AVE CHICAGO IL 60637 | 20-22-400-005-0000 | $10,000 |
| 7 | 6329 S PAULINA AVE CHICAGO IL 60636 | 20-19-206-015-0000 | $10,000 |
| 8 | 6945 S CLAREMONT AVE CHICAGO IL 60636 | 20-19-322-019-0000 | $10,000 |
| 9 | 1444 W MARQUETTE AVE CHICAGO IL 60636 | 20-20-118-038-0000 | $10,000 |
| 10 | 5640 S MARSHFIELD AVE CHICAGO IL 60636 | 20-18-214-039-0000 | $10,000 |
| 11 | 6552 S WINCHESTER AVE CHICAGO IL 60636 | 20-19-216-041-0000 | $10,000 |
| 12 | 6327 S WOOD ST CHICAGO IL 60636 | 20-19-204-011-0000 | $10,000 |
| 13 | 6743 S WOLCOTT AVE CHICAGO IL 60636 | 20-19-402-022-0000 | $10,000 |
| 14 | 6156 S WINCHESTER AVE CHICAGO IL 60636 | 20-18-416-043-0000 | $10,000 |
| 15 | 5648 S MARSHFIELD AVE CHICAGO IL 60636 | 20-18-214-042-0000 | $10,000 |
| 16 | 6142 S MARSHFIELD AVE CHICAGO IL 60636 | 20-18-422-040-0000 | $10,000 |
| 17 | 6001 S WOOD ST CHICAGO IL 60636 | 20-18-412-001-0000 | $10,000 |
| 18 | 6017 S HERMITAGE AVE CHICAGO IL 60636 | 20-18-413-007-0000 | $10,000 |
| 19 | 6152 S HERMITAGE AVE CHICAGO IL 60636 | 20-18-420-045-0000 | $10,000 |
| 20 | 7034 S ELIZABETH ST CHICAGO IL 60636 | 20-20-330-037-0000 | $10,000 |
| 21 | 6924 S ELIZABETH ST CHICAGO IL 60636 | 20-20-322-028-0000 | $10,000 |
| 22 | 7024 S ELIZABETH ST CHICAGO IL 60636 | 20-20-330-037-0000 | $10,000 |
| 23 | 6746 S MARSHFIELD AVE CHICAGO IL 60636 | 20-19-406-038-0000 | $10,000 |
| 24 | 6449 S SEELEY AVE CHICAGO IL 60636 | 20-19-114-018-0000 | $10,000 |
| 25 | 5735 S HERMITAGE AVE CHICAGO IL 60636 | 20-18-221-015-0000 | $10,000 |
| 26 | 1207 W 71ST ST CHICAGO IL 60636 | 20-29-104-029-0000 | $10,000 |
| 27 | 6924 S THROOP ST CHICAGO IL 60636 | 20-20-321-033-0000 | $10,000 |
| 28 | 6727 S MARSHFIELD AVE CHICAGO IL 60636 | 20-19-407-010-0000 | $10,000 |
| 29 | 7008 S LAFLIN ST CHICAGO IL 60636 | 20-20-325-021-0000 | $10,000 |
| 30 | 6653 S MARSHFIELD AVE CHICAGO IL 60636 | 20-19-231-020-0000 | $10,000 |
| 31 | 6452 S SEELEY AVE CHICAGO IL 60636 | 20-19-113-045-0000 | $10,000 |
| 32 | 6355 S LAFLIN ST CHICAGO IL 60636 | 20-20-102-025-0000 | $10,000 |
| 33 | 6916 S THROOP ST CHICAGO IL 60636 | 20-20-321-029-0000 | $10,000 |
| 34 | 5941 S ELIZABETH ST CHICAGO IL 60636 | 20-17-307-021-0000 | $10,000 |

Initial
AH

# EXHIBIT Q

| Form 1 # | Property Address | Property PIN | Marketing Price |
|---|---|---|---|
| 35 | 10449 S STATE ST CHICAGO IL 60628 | 25-15-110-018-0000 | $10,000 |
| 36 | 317 W 108TH PL CHICAGO IL 60628 | 25-16-411-013-0000 | $10,000 |
| 37 | 10562 S LAFAYETTE AVE CHICAGO IL 60628 | 25-16-215-060-0000 | $10,000 |
| 38 | 10843 S EDBROOK AVE CHICAGO IL 60628 | 25-15-311-016-0000 | $10,000 |
| 39 | 119 W 110TH PL CHICAGO IL 60628 | 25-16-429-009-0000 | $10,000 |
| 40 | 11558 S PERRY AVE CHICAGO IL 60628 | 25-21-405-046-0000 | $10,000 |
| 41 | 10550 S STATE ST CHICAGO IL 60628 | 25-16-216-046-0000 | $10,000 |
| 42 | 140 E 119TH ST CHICAGO IL 60628 | 25-22-321-032-0000 | $10,000 |
| 43 | 5130 S PAULINA AVE CHICAGO IL 60609 | 20-07-405-034-0000 | $10,000 |
| 44 | 10732 S EDBROOK AVE CHICAGO IL 60628 | 25-15-302-027-0000 | $10,000 |
| 45 | 10744 S PERRY AVE CHICAGO IL 60628 | 25-16-404-039-0000 | $10,000 |
| 46 | 10504 S PERRY AVE CHICAGO IL 60628 | 25-16-214-031-0000 | $10,000 |
| 47 | 11621 S NORMAL AVE CHICAGO IL 60628 | 25-21-315-009-0000 | $10,000 |
| 48 | 12056 S NORMAL AVE CHICAGO IL 60628 | 25-28-113-041-0000 | $10,000 |
| 49 | 11552 S STATE ST CHICAGO 60628 | 25-21-407-033-0000 | $10,000 |
| 50 | 4312 W FLOURNOY ST CHICAGO IL 60624 | 16-15-400-028-0000 | $10,000 |
| 51 | 4451 W JACKSON BLVD CHICAGO IL 60624 | 16-15-120-004-0000 | $10,000 |
| 52 | 815 S KARLOV AVE CHICAGO IL 60624 | 16-15-414-054-0000 | $10,000 |
| 53 | 4318 W GLADYS AVE CHICAGO IL 60624 | 16-15-216-037-0000 | $10,000 |
| 54 | 1528 S KOLIN AVE CHICAGO IL 60623 | 16-22-223-026-0000 | $10,000 |
| 55 | 1454 S AVERS AVE CHICAGO IL 60623 | 16-23-116-042-0000 | $10,000 |
| 56 | 1517 S MILLARD AVE CHICAGO IL 60623 | 16-23-129-006-0000 | $10,000 |
| 57 | 1506 S LAWNDALE AVE CHICAGO IL 60623 | 16-23-127-023-0000 | $10,000 |
| 58 | 5723 S SANGAMON ST CHICAGO IL 60621 | 20-17-221-008-0000 | $10,000 |
| 59 | 5716 S EMERALD AVE CHICAGO IL 60621 | 20-16-112-024-0000 | $10,000 |
| 60 | 6644 S MAY ST CHICAGO IL 60621 | 20-20-224-031-0000 | $10,000 |
| 61 | 453 W 61ST ST CHICAGO IL 60621 | 20-16-317-002-0000 | $10,000 |
| 62 | 6618 S MAY ST CHICAGO IL 60621 | 20-20-224-022-0000 | $10,000 |
| 63 | 6034 S CARPENTER ST CHICAGO IL 60621 | 20-17-410-031-0000 | $10,000 |
| 64 | 5701 S ABERDEEN ST CHICAGO IL 60621 | 20-17-218-001-0000 | $10,000 |
| 65 | 5954 S MORGAN ST CHICAGO IL 60621 | 20-17-403-042-0000 | $10,000 |
| 66 | 6145 S MORGAN ST CHICAGO IL 60621 | 20-17-420-019-0000 | $10,000 |

Initial
AH

# EXHIBIT Q

| Form 1 # | Property Address | Property PIN | Marketing Price |
|---|---|---|---|
| 67 | 6023 S ABERDEEN ST CHICAGO IL 60621 | 20-17-410-007-0000 | $10,000 |
| 68 | 1017 W 61ST ST CHICAGO IL 60621 | 20-17-419-003-0000 | $10,000 |
| 69 | 7219 S ABERDEEN ST CHICAGO IL 60621 | 20-29-210-007-0000 | $10,000 |
| 70 | 6617 S PEORIA ST CHICAGO IL 60621 | 20-20-230-008-0000 | $10,000 |
| 71 | 6014 S ABERDEEN ST CHICAGO IL 60621 | 20-17-409-024-0000 | $10,000 |
| 72 | 7019 S CARPENTER ST CHICAGO IL 60621 | 20-20-427-006-0000 | $10,000 |
| 73 | 6736 S LOWE AVE CHICAGO IL 60621 | 20-21-302-031-0000 | $10,000 |
| 74 | 5535 S EMERALD AVE CHICAGO IL 60621 | 20-16-101-014-0000 | $10,000 |
| 75 | 5836 S LOWE AVE CHICAGO IL 60621 | 20-16-122-025-0000 | $10,000 |
| 76 | 6135 S MORGAN ST CHICAGO IL 60621 | 20-17-420-014-0000 | $10,000 |
| 77 | 7159 S CARPENTER ST CHICAGO IL 60621 | 20-29-203-045-0000 | $10,000 |
| 78 | 5612 S LASALLE ST CHICAGO IL 60621 | 20-16-204-047-0000 | $10,000 |
| 79 | 9036 S RACINE AVE CHICAGO IL 60620 | 25-05-131-030-0000 | $10,000 |
| 80 | 7509 S NORMAL AVE CHICAGO IL 60620 | 20-28-305-002-0000 | $10,000 |
| 81 | 8224 S EMERALD AVE CHICAGO IL 60620 | 20-33-122-031-0000 | $10,000 |
| 82 | 407 W 77TH ST CHICAGO IL 60620 | 20-28-320-009-0000 | $10,000 |
| 83 | 7741 S LOWE AVE CHICAGO IL 60620 | 20-28-317-011-0000 | $10,000 |
| 84 | 704 E 90TH PL CHICAGO IL 60619 | 25-03-227-017-0000 | $10,000 |
| 85 | 7608 S LANGLEY ST CHICAGO IL 60619 | 20-27-413-024-0000 | $10,000 |
| 86 | 9152 S DAUPHIN AVE CHICAGO IL 60619 | 25-02-300-028-0000 | $10,000 |
| 87 | 7330 S CHAMPLAIN AVE CHICAGO IL 60619 | 20-27-221-010-0000 | $10,000 |
| 88 | 966 E 79TH ST CHICAGO IL 60619 | 20-26-321-008-0000 | $10,000 |
| 89 | 970 E 79TH ST CHICAGO IL 60619 | 20-26-321-010-0000 | $10,000 |
| 90 | 9216 S HARPER AVE CHICAGO IL 60619 | 25-02-411-022-0000 | $10,000 |
| 91 | 9205 S UNIVERSITY AVE CHICAGO IL 60619 | 25-02-314-003-0000 | $10,000 |
| 92 | 9032 S GREENWOOD AVE CHICAGO IL 60619 | 25-02-116-029-0000 | $10,000 |
| 93 | 8228 S MANISTEE AVE CHICAGO IL 60617 | 21-31-129-028-0000 | $10,000 |
| 94 | 8623 S MARQUETTE AVE CHICAGO IL 60617 | 21-31-330-009-0000 | $10,000 |
| 95 | 7933 S MARQUETTE AVE CHICAGO IL 60617 | 21-31-106-018-0000 | $10,000 |
| 96 | 12948 AVENUE O CHICAGO IL 60617 | 26-30-416-004-0000 | $10,000 |
| 97 | 2943 E 97TH ST CHICAGO IL 60617 | 26-06-130-002-0000 | $10,000 |
| 98 | 8805 S HOUSTON ST CHICAGO IL 60617 | 26-06-211-002-0000 | $10,000 |

Initial

# EXHIBIT Q

| Form 1 # | Property Address | Property PIN | Marketing Price |
|---|---|---|---|
| 99 | 8032 S MANISTEE AVE CHICAGO IL 60617 | 21-31-114-033-0000 | $10,000 |
| 100 | 8222 S MANISTEE AVE CHICAGO IL 60617 | 21-31-129-025-0000 | $10,000 |
| 101 | 8545 S BURNHAM AVE CHICAGO IL 60617 | 21-31-416-014-0000 | $10,000 |
| 102 | 7942 S MANISTEE AVE CHICAGO IL 60617 | 21-31-106-035-0000 | $10,000 |
| 103 | 8015 S MANISTEE AVE CHICAGO IL 60617 | 21-31-115-005-0000 | $10,000 |
| 104 | 8200 S MARQUETTE AVE CHICAGO IL 60617 | 21-31-128-016-0000 | $10,000 |
| 105 | 8801 S HOUSTON ST CHICAGO IL 60617 | 26-06-211-001-0000 | $10,000 |
| 106 | 2814 E 80TH ST CHICAGO IL 60617 | 21-31-200-039-0000 | $10,000 |
| 107 | 8137 S MUSKEGON AVE CHICAGO IL 60617 | 21-31-217-016-0000 | $10,000 |
| 108 | 8056 S MUSKEGON AVE CHICAGO IL 60617 | 21-31-208-045-0000 | $10,000 |
| 109 | 8054 S MUSKEGON AVE CHICAGO IL 60617 | 21-31-208-044-0000 | $10,000 |
| 110 | 8052 S MUSKEGON AVE CHICAGO IL 60617 | 21-31-208-043-0000 | $10,000 |
| 111 | 8050 S MUSKEGON AVE CHICAGO IL 60617 | 21-31-208-042-0000 | $10,000 |
| 112 | 8218 S MANISTEE AVE CHICAGO IL 60617 | 21-31-129-024-0000 | $10,000 |
| 113 | 8431 S BRANDON AVE CHICAGO IL 60617 | 21-32-204-013-0000 | $10,000 |
| 114 | 8235 S MARQUETTE AVE CHICAGO IL 60617 | 21-31-129-013-0000 | $10,000 |
| 115 | 10411 S BENSLEY AVE CHICAGO IL 60617 | 25-12-441-006-0000 | $10,000 |
| 116 | 5350 S PEORIA ST CHICAGO IL 60609 | 20-08-421-044-0000 | $10,000 |
| 117 | 611 W 51st St CHICAGO IL 60609 | 20-09-303-042-0000 | $10,000 |
| 118 | 5144 S WOLCOTT AVE CHICAGO IL 60609 | 20-07-401-041-0000 | $10,000 |
| 119 | 1508 W GARFIELD BLVD CHICAGO IL 60609 | 20-08-317-043-0000 | $10,000 |
| 125 | 1413 S. Kostner Ave Chicago, IL 60623 | 16-22-216-003-0000 | $10,000 |
| 126 | 1615 S. Kedvale Ave Chicago, IL 60623 | 16-22-405-011-0000 | $10,000 |
| 128 | 635 N Leamington Ave Chicago, IL 60644 | 16-09-209-008-0000 | $10,000 |
| 129 | 700 E. 90th Pl. Chicago, IL 60619 | 25-03-227-016-0000 | $10,000 |

Initial

AH

# BANKRUPTCY TRUSTEE ADDENDUM

This Rider is attached to and hereby made a part of that certain preprinted Exclusive Listing Agreement between Seller, **Ariane Holtschlag, Trustee in Bankruptcy,** and Broker Chicago's Real Estate Agency, LLC. Seller is a bankruptcy Trustee representing a bankruptcy estate. Any conflict or inconsistency between the terms of this Rider and the preprinted form to which it is attached shall be governed by and resolved with reference to the terms of this Rider.

R-l. No commission shall be deemed to be earned by or payable to Chicago's Real Estate Agency, LLC unless and until both (i) the Real Estate is sold to a purchaser introduced to the Real Estate during the term of the within listing agreement and (ii) the agreed purchase price is paid to Seller in good funds or otherwise realized by Seller. Chicago's Real Estate Agency, LLC shall have no right to compel Seller to seek remedial relief against any defaulting purchaser of the Real Estate, nor shall Chicago's Real Estate Agency, LLC have any right to participate in the proceeds of any forfeited earnest money resulting from any such breach.

R-2. This exclusive listing agreement and all offers and contracts for the sale or disposition of the Real Estate are and at all times shall be subject to and conditioned upon the prior approval of the Bankruptcy Court in proceedings pending in the United States Bankruptcy Court for the Northern District of Illinois captioned **"In re QCD Financial, LLC" under case number 25-11551**. Seller shall employ said Chicago's Real Estate Agency, LLC with and shall petition said court for approval as soon as practicable. No offer presented to Seller (through Chicago's Real Estate Agency, LLC's efforts or otherwise) shall give rise to any obligation on the part of Seller to the proposed purchaser, nor to Chicago's Real Estate Agency, LLC or any cooperating broker, unless and until the contract is approved by such court, and all requirements to assure the due and timely closing thereof are similarly authorized and closing is consummated.

R-3. It is expressly understood and agreed by and between the parties hereto, anything herein to the contrary notwithstanding, that each and all of the warranties, indemnities, representations, covenants, undertakings and agreements herein made on the part of the Seller while in form purporting to be the warranties, indemnities, representations, covenants, undertakings and agreements of said Seller are nevertheless each and every one of them, made and intended not as personal warranties, indemnities, representations, covenants, undertakings and agreements by the Seller or for the purpose or with the intention of binding said Seller personally but are made and intended for the purpose of binding only the Real Estate and this instrument is executed and delivered by said Seller not in her own right, but solely in the exercise of the powers conferred upon him as such Trustee; and that no personal liability or personal responsibility is assumed by nor shall it at any time be asserted or enforceable against Trustee on account of this instrument or on account of any warranty, indemnity, representation, covenant, undertaking or agreement of the said Trustee in this instrument contained, either expressed or implied, all such personal liability, if any, being expressly waived and released.

| CHICAGO'S REAL ESTATE AGENCY, LLC: | OWNER: |
|---|---|
| Donald J. Felton, II | Ariane Holtschlag, not individually, but solely as Trustee of the Bankruptcy Estate of QCD Financial LLC, |
| By: DocuSigned by: [signature] 218E10DDB69E4CD... ____________________ | By: Signed by: Ariane Holtschlag 581FC60C77DE4F7... ____________________ |